UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO.: 1:08-CR-95-TLS |
| | ) | (CAUSE NO.: 1:15-CV-362) |
| DAMARCUS JOHNSON | ) | |

**OPINION AND ORDER**

The Defendant is serving a term of imprisonment after a jury found him guilty of federal gun and drug offenses. This matter is before the Court on his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF No. 240], supporting Memorandum [ECF No. 243], and reply brief [ECF No. 250], and on the Government's Response in Opposition to Petitioner's Motion Under 28 U.S.C. § 2255 [ECF No. 247].

The Defendant maintains that his conviction should be vacated because his trial counsel, Attorney Linda Wagoner, provided ineffective assistance in violation of the Sixth Amendment. For the reasons stated in this Opinion and Order, the Court finds that the files and records of the case conclusively show that the Defendant is not entitled to habeas relief.

**BACKGROUND**

A police officer walked up to a car parked in a public parking lot that the officer was patrolling and tapped on the passenger side window. The Defendant, who was the only person in the car and seated in the driver's position, rolled down the window. When the Defendant saw the officer, he glanced at the area next to him, between the seat and the center console. The officer followed the Defendant's gaze and saw a gun protruding between the seat and the console. The

officer also saw what he believed was crack-cocaine residue scattered across the front passenger seat. The police arrested the Defendant, searched the car, and seized the gun and a Crown Royal bag that had been found in the glove box. The bag contained a distribution quantity of crack cocaine and a scale. The Defendant was charged with possessing with intent to distribute crack cocaine, 21 U.S.C. § 841(a)(1), carrying a gun during and in relation to the possession, 18 U.S.C. § 924(c), and possessing a firearm as a felon, 18 U.S.C. § 922(g). Before trial he moved to suppress the gun and drugs, but the district court denied the motion. A jury found the Defendant guilty on all counts.

The Defendant appealed the denial of his motion to suppress, but the Seventh Circuit agreed that there was no Fourth Amendment violation. *United States v. Johnson,* 496 F. App'x 668 (7th Cir. 2012).

## DISCUSSION

**A.** **Standard**

Section 2255 allows a person convicted of a federal crime to seek to vacate, set aside, or correct his sentence. This relief is available only in limited circumstances, such as where an error is of jurisdictional or constitutional magnitude, or where there has been an error of law that "constitutes a fundamental defect which results in a complete miscarriage of justice." *See Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004). Motions to vacate a conviction or correct a sentence ask a court to grant an extraordinary remedy to a person who has already had an opportunity of full process. *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006). A motion under § 2255 "is neither a recapitulation of nor a substitute for a direct appeal." *Olmstead v.*

2

*United States*, 55 F.3d 316, 319 (7th Cir. 1995). A court may deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

In seeking to prove that his counsel rendered ineffective assistance, as the Defendant does here, he "bears a heavy burden." *Jones v. Page*, 76 F.3d 831, 840 (7th Cir. 1996) (citation omitted). To establish ineffective assistance of counsel, a petitioner must show that: (1) his attorney's performance "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984); and (2) there is a reasonable probability that "but for counsel's unprofessional errors the result of the proceeding would have been different," *id.* at 694. "A failure to establish either prong results in a denial of the ineffective assistance of counsel claim." *Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2002) (citation omitted).

The performance prong requires the Defendant to specifically identify acts or omissions that form the basis of his claim of ineffective assistance. *Strickland*, 466 U.S. at 690. Based on the totality of the circumstances, the court must then determine whether the identified acts and omissions fall outside the range of professionally competent assistance. *Id.* In assessing whether counsel's deficiency caused prejudice, the question is whether it is "reasonably likely" that the outcome would have been different. *Harrington v. Richter*, 562 U.S. 86, 111 (2011) (quoting *Strickland*, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." *Id.* (citing *Strickland*, 466 U.S. at 693).

**B.     The Defendant's Claims**

The Defendant argues that Attorney Wagoner "conceded" during her opening statement

3

that the Defendant was guilty of the drug and firearm charges for which he stood trial. He asserts that she "set the stage in order to help the government not only prove its case but to convey to the jury that she also agreed that [he] was guilty." (Mem. 5, ECF No. 39.) He points to the following statements as revealing his counsel's alleged concession of guilt:

> You will hear some evidence about what his behavior when he has encounters with the police usually is. If you pay close attention to the details, and the details of his behavior and those kinds of things, you will have a reasonable doubt that he knew that the crack cocaine or the gun were in that car on that night. Because he didn't act in accordance with the way he normally acts when the police try to encounter him. He normally runs.

(Day 1 Trial Tr. II 169–70, ECF No. 171 at 22.) The Defendant argues that this was a "sly and slick way" of saying he was guilty, and that Attorney Wagoner "had been planning to sabotage [his] defense the whole time" because she wanted to see him spend the rest of his life in prison. (Mem. 5–6.) He maintains that this became obvious when she did not "bring forth testimony from defense witnesses that [he] did not know the crack cocaine and firearm [were] in the car." (*Id.* at 6.) Further, she did not produce evidence that he normally runs when confronted by police, even though she mentioned it in her opening statement. According to the Defendant, the jury could have understood her words—that they would "have a reasonable doubt that he knew that the crack cocaine and gun were in the car on that night"—as the opposite: a declaration "that they could find 'beyond a reasonable doubt that he knew'" that these items were in the car. (*Id. at* 6–7.)

No amount of convoluted argument can change the plain meaning of Attorney Wagoner's words. Neither can the Defendant's unsupported and outlandish accusations regarding her motives. Attorney Wagoner stated to the jury that they "would have a reasonable doubt that he knew that the crack cocaine or the gun were in that car on that night" after they paid "close

4

attention to the details." (Day 1 Trial Tr. II 169–70.) She told the jury that the Defendant "maintains that he is not guilty" of the charges (*id.* at 169), and that he was "asking at the conclusion of the case that [the jury] return verdicts of not guilty on all three counts" (*id.* at 170).

It is important to set this case in the context in which it came to trial. The theories of defense available to the Defendant and Attorney Wagoner were severely limited. The Court had already denied the Defendant's motion to suppress. Therefore, the Defendant could not prevent Officer Nicholas Lichtsinn from telling the jury what he saw when he looked into the car where the Defendant was the sole occupant. Officer Lichtsinn testified that he saw the magazine portion of a semi-automatic handgun located between the front passenger seat and center console, which he then recovered. He also saw a small amount of an off white, rock-like substance on the seat, which he later tested as positive for crack cocaine. Officer Lichtsinn's search of the glove compartment led to the discovery of more crack cocaine, a scale with crack cocaine residue, and paperwork with the Defendant's name on it. The Defendant had two cellular phones on his person, and another one inside the car, at the time of the arrest. He was also carrying more than $2,000 in cash, which was bundled by denomination. Verizon and Nipsco bills, as well as Western Union receipts, bearing the Defendant's name were located in the car.

There were no disputes about the nature of the evidence, or the quantity of drugs. Attorney Wagoner attempted to create issues with continuity of the evidence. The Defendant had three prior felonies, which was a stipulated fact at trial. Portions of recordings from telephone calls the Defendant made from the jail were played for the jury. During the conversation, the Defendant referred to the officer seeing "my gun" and to the minimum for "the dope I had."

Unable to prevent Officer Lichtsinn's testimony or otherwise attack the evidence, it was a

reasonable strategy to attempt to defend against the charges by showing that the Defendant was not aware that the gun and the drugs were in the car. There were limited ways in which this could be accomplished. One was to suggest that the Defendant would have acted differently upon being approached by Officer Lichtsinn if he knew about the contraband. The Defendant argues that Attorney Wagoner did not pursue that route, even though she outlined it in the opening statement. The record shows otherwise. Attorney Wagoner questioned Officer Lichtsinn about the Defendant's compliance.

> Q. You are aware Indiana does have a charge called resisting law enforcement that can be effectuated by running away from the police?
> A. Yes.
> Q. And it can also be effectuated by driving away from the police?
> A. Yes, ma'am.
> Q. And at no time during your encounter with Mr. Johnson on this night did he attempt to put his car in gear, is that correct?
> A. No.
> Q. No, he did not?
> A. No, he did not have his car in gear.
> Q. And the car was still running while you approached it and knocked on the window?
> A. Yes, ma'am.

(Trial Tr. II 239–40.) Additionally, Attorney Wagoner procured testimony from the Defendant that his typical reaction to the police is "[t]o flee." (Day 2 Trial Tr. 118.) The Defendant, in response to challenge from the Government that he fled on every occasion, stated that he would flee "[i]f I have possession or drugs or something on me." (*Id.*) The Defendant does not indicate what additional evidence was available on this point. Thus, the Court is not persuaded that the failure to pursue this line further was conduct that fell outside the range of professionally competent assistance, or that it caused the jury to misconstrue Attorney Wagoner's opening statement about reasonable doubt, or that it likely impacted the outcome of the trial.

Another strategy for advancing the theory that the Defendant was not aware of the contraband was to present evidence that someone else had control of the car that day, and that the Defendant did not see the gun or drugs before Officer Lichtsinn discovered them. However, for this to be effective, the jury would also have to believe that Officer Lichtsinn was lying about where he saw the gun and the crack cocaine residue. The Defendant attempted to accomplish all of this through his own testimony.

The Defendant testified at trial consistent with his defense, which had been introduced during the opening statement, that he did not know the contraband was inside the car. He told the jury that he let his younger brother drive the car that day, that he did not inspect the car when he got it back, and that he did not see any weapon in his car. He also explained why he was waiting in the parking lot. The Defendant testified to a version of events as it related to the encounter with Officer Lichtsinn that differed significantly from the version the Officer reported in November 2008, and relayed to the jury at trial.

To believe the Defendant's version was to believe that Officer Lichtsinn lied about seeing a weapon. The Defendant claimed that he never saw a gun in his car the night he was arrested, despite ample opportunity to do so. The Defendant also testified that the cash he was carrying did not have the rubber bands on it that were depicted in the photograph Officer Lichtsinn took, but was instead "all in one pile."[1] (Day 2 Trial Tr. 113.) The Defendant told the jury that he did not have any knowledge that drugs were inside the car. To explain the phone call where he referred to "my gun," the Defendant stated that he was only repeating what Officer

---

[1] One of the Government's witnesses testified that the manner of bundling depicted in the photograph was commonly used by dealers in drug distribution operations.

Lichtsinn said in court. On cross-examination, when the Government's counsel pointed out that in January 2009, when the conversation took place, he had not yet been in court with Officer Lichtsinn, the Defendant said it was repeated from the Officer's paperwork, specifically a probable cause affidavit. After the Defendant testified, the Government recalled Officer Lichtsinn to highlight the aspects of the Defendant's testimony that, according to Officer Lichtsinn, did not happen as the Defendant claimed they did.

If the jury believed Officer Lichtsinn, it was entitled to believe that the Defendant was fully aware of the firearm, as well as the drugs, and that he possessed those drugs with the intent to distribute them. That the Government was able to discredit the Defendant's testimony on most of his points was not within counsel's control. Neither was how credible Officer Lichtsinn appeared to the jury. The Defendant, however, claims that Attorney Wagoner could have done more to boost the Defendant's version of events, and that she provided ineffective assistance when she did not do so. Specifically, he maintains that she should have brought forth testimony from other witnesses that would support his claim that the gun and drugs were not his. According to the Defendant, Attorney Wagoner failed to locate and secure the testimony of two witnesses that could have helped his case: Raul Resendiz and Nicholas Rogan.

The Defendant's claim that Resendiz would have been a proper witness hinges on his assertion that Resendiz would have changed the testimony he previously offered at the hearing the Court held on the Defendants' motion to suppress. (*See* Suppression Hrg. Tr. 152–170, ECF No. 90.) Attorney Wagoner stated in her letters to the Defendant that Resendiz had been a "terrible witness" at the suppression hearing (5/28/10 Letter, ECF No. 243 at 25), and that "[n]either of the eye witnesses helped you nor were particularly cooperative" (9/9/10 Letter, ECF

8

No. 243 at 20). This reveals that Attorney Wagoner made a post-investigation strategic decision that Resendiz would not be a good witness for the Defendant. Moreover, Attorney Wagoner states in an Affidavit that she had already learned from one of the other potential witnesses, which she had subpoenaed because the Defendant insisted the witness would corroborate the Defendant's account of the encounter with Officer Lichtsinn, that this potential witness was with Resendiz the night of the Defendant's arrest and did not see an officer, but did see one squad car in the parking lot. (Wagoner Aff. ¶ 15, ECF No. 247.) This decision is not challengeable despite the Defendant's claims that Resendiz would change his story to corroborate the Defendant's account of the encounter with Officer Lichtsinn.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690; *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable."). "The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record." *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990).

On the other side, the Defendant has not submitted any sworn declaration or affidavit from Resendiz. Accordingly, there is no evidence in the record that Resendiz's testimony would have been any different than it was at the suppression hearing and would have supported the Defendant's version of events or otherwise assisted the Defendant. In any event, despite her

9

belief that it would not be prudent, Attorney Wagoner did attempt to call Resendiz for trial. He simply did not appear. (Wagoner Aff. ¶ 11.) Attorney Wagoner's actions, as it relates to calling Resendiz as a witness for the Defendant, did not violate the Defendant's Sixth Amendment right to counsel.

The other witness the Defendant identifies in his Memorandum, Nicholas Rogan, is the Defendant's brother. In his briefing, the Defendant claims that, after the jury was selected, Rogan reached out to him and confessed that someone else had been in the vehicle and placed the firearm, crack cocaine, and other contraband in the car, but that Rogan had failed to tell the Defendant this when he returned the car. The Defendant maintains that he notified Attorney Wagoner of this information, but that she dismissed it and said that she would not contact, interview, or call Rogan to testify.

Attached to the Defendant's Memorandum is the Declaration of Rogan, which sets out how the drugs came to be in the Defendant's car. Rogan states that, after he borrowed the Defendant's car, he picked up a friend named Barney, who brought "a Fifth of Crown Royal bag" that he claimed had "clippers and medicine" inside. (Rogan Decl. ¶¶ 9, 11, ECF No. 243.) Barney placed the bag in the glove compartment, and stated that "he had his baby with him." (*Id.* ¶ 12.) He then "pulled out a crome [sic] and grayish type of weapon out [sic] and slide [sic] it in between the passenger seat." (*Id.* ¶ 13.) After riding around for awhile and getting food at McDonalds, they returned to Rogan's house. The Defendant retrieved his car around 7:00 p.m., but Rogan failed to tell the Defendant "about the gun being stuck in the passenger seat or the purple bag that Barney placed in the glove compartment." (*Id.* ¶ 18.) Although Rogan had plans to meet up with the Defendant later that night, they never did, and "Barney failed to get his gun

10

or purple bag back." (*Id.* ¶ 20.) According to the Declaration, when Rogan and Barney found out, "in the wee hours of the night on November 19, 2008," that the Defendant had been arrested, they "panicked, but we had vowed never to tell anybody that the gun and the drugs inside the Crown Royal bag [were] not my brother's." (*Id.* ¶ 22.) The Declaration ends with, "I got scared and didn't want to help Damarcus out." (*Id.* ¶ 23.)

Rogan's Declaration is dated December 15, 2015. Nowhere in the Declaration does Rogan state that he contacted the Defendant during his trial in 2010, or that he would have testified to these matters at trial. Thus, there is no evidence in the record that Attorney Wagoner should have been aware that there was a witness who would identify someone else as the owner of the firearm and drugs. In the communications between the Defendant and Attorney Wagoner , the only potential witnesses that are discussed are Raul Resendiz, Lonnie White, Steve Gerber, FWPD Officer Tony Sketina, and someone referred to as "Legs." (Exhibit A, ECF No. 243 at 17–31.) All of these witnesses were identified by the Defendant as having potentially useful information to counter Officer Lichtsinn's testimony about the parking lot encounter. The Defendant did not contend that these potential witnesses were persons who could verify that he allowed his brother to borrow his car the day that he was arrested. Particularly curious is Rogan's absence from the Defendant's communications with counsel about potential witnesses, given that the Defendant would have known, well before trial, that his brother drove his car that day.

Attorney Wagoner verifies by Affidavit that she did not have knowledge of the information contained in Rogan's December 15, 2015, Declaration until it was filed with the habeas motion. There is no credible evidence that Attorney Wagoner failed to investigate this

11

line of defense when the Defendant himself did not mention his brother as a witness before trial, and Rogan's Declaration, completed five years after trial, does not state that he ever attempted to come forward.[2]

Even if the Defendant could satisfy the first *Strickland* prong, there is not a reasonable likelihood that, but for Rogan's testimony, the trial result would have been different. *See Harrington*, 562 U.S. at 112. This was not a close case when it came to witness credibility. It is not reasonably likely that the testimony contained in the Declaration would have trumped the other evidence of the Defendant's guilt. *See Strickland*, 466 U.S. at 696 (explaining that under the prejudice inquiry, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The Declaration does not explain why someone, who is identified only as "Barney," would leave thousands of dollars of crack cocaine in another person's car.[3] Or why he would take his gun, which he referred to as his "baby," off his person and slide it in between the passenger seat of a friend's brother's car. Or further, why he would then leave the gun in the car when the car was going to be returned to its owner where he would no longer have access to it. There is no suggestion that Rogan would have been able to explain why he did not remind Barney to gather his belongings when they exited the car, or when the Defendant came to retrieve it.

---

[2] According to the Presentence Investigation Report prepared for the Defendant, the Defendant has three full siblings, none of which are identified as being named Nicholas Rogan. The Defendant advised that his father may have more children, but that he did not know any of them.

[3] At trial, the Government elicited testimony that the street value of the drugs found in the Defendant's car was between $6,000 and $9,000. This supported the Government's claim that the drugs were of distribution quantity. The Government also argued during its closing that it was not reasonable to believe that the rightful owner (if it was not the Defendant) would leave that quantity of drugs in a car unattended for the Defendant to access.

Moreover, Rogan's statements, as presented in the Declaration, contradict the Defendant's testimony that there was no gun in the car, or at least no gun that was visible to him. (*See* Day 2 Trial Tr. 111 ("Q. And when you were driving your car, did you see any weapon in your car? A. No, there was nothing on my seats or between my seats. I was driving the car from 7:00 until at least 10:30."); *Id.* at 116 ("Q. No gun tucked between the passenger seat and the center console [when you got your car back]? A. No, I would have seen that.").) Even if the jury had heard testimony that Barney left a gun in the Defendant's car, the jury would not have had reasonable doubt unless it also believed that Officer Lichtsinn was lying about the location of the gun and the crack cocaine on the seat, both of which he testified were visible to him as he looked through the passenger window. If Officer Lichtsinn could see the weapon, so could the Defendant. Additionally, the jury would have had to believe that the Defendant, not Officer Lichtsinn, was telling the truth about the bundling of the $2,000 found on the Defendant, and that the Defendant had other legitimate means to acquire that amount of cash, most of which was in smaller denominations. The jury would also have had to discount the Defendant's own words during a telephone call that what Officer Lichtsinn saw was the butt of "my gun."[4]

In sum, the evidence against the Defendant was overwhelming. It is not substantially likely that the additional testimony from Rogan would have raised a reasonable doubt that the Defendant knowingly possessed the drugs and the firearm located inside his car on the night he was arrested. The Defendant's claims about his counsel's performance do not undermine

---

[4] The Defendant's testimony that he was only repeating what Officer Lichtsinn wrote in a probable cause affidavit was entirely unbelievable. As the Government noted during closing, Officer Lichtsinn would not have used the words "my gun" to reference the gun he saw in the Defendant's car, as it was not Officer Lichtsinn's gun. The Government's argument is well taken, as the use of the word "my" in relation to an object indicates the speaker's ownership of that object.

confidence in the jury's determination.

Because the Defendant has not alleged any facts that would entitle him to the relief he seeks, the Court is not required to grant him a hearing. *See Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015); *see also* 28 U.S.C. § 2255(b) (no hearing warranted where "the files and records of the case conclusively show that the prisoner is entitled to no relief").

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, the Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rule 11 of Rules Governing Section 2255 Proceedings. The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation marks omitted); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983). Where the district court has rejected the constitutional claim on the merits, "the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. A defendant is not required to show that he will ultimately succeed on appeal. *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003) (stating that the question is the "debatability of the underlying constitutional claim, not the resolution of that debate").

Rule 11(a) permits a district court to direct the parties to submit arguments on whether a certificate of appealability should issue. Additional argument is not necessary here because no reasonable jurist could conclude that the Court's assessment of the Sixth Amendment claim was debatable or wrong where neither prong of *Strickland* has been established. The Court will not issue the Defendant a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF Nos. 240 & 243]. Because reasonable jurists would not debate that the Motion fails to present a valid claim of the denial of a constitutional right, or that the Motion should have been resolved in a different manner, the Court DECLINES to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(3).

SO ORDERED on May 8, 2017.

                                           s/ Theresa L. Springmann
                                          CHIEF JUDGE THERESA L. SPRINGMANN
                                          UNITED STATES DISTRICT COURT